(174 App. Div. 229)

### FITCH v. SHUBERT THEATRICAL CO.

(Supreme Court, Appellate Division, First Department. October 20, 1916.)

1. COPYRIGHTS ⬅═50—ROYALTIES—"PLAYED IN STOCK."

 The term "played in stock" is a term having a technical meaning in the trade, referring to a play produced by some company other than the owner under a license, upon the customary commission of 10 per cent. of the gross receipts.

 [Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 47, 49; Dec. Dig. ⬅═50.]

2. EVIDENCE ⬅═182—DOCUMENTARY EVIDENCE—ADMISSION OF COPY—PREDICATES.

 A letterpress copy of defendant's letter, in the absence of proof that it was mailed by any office boy whose duty it was to mail it, or that such was the defendant's custom, or that office boys actually and regularly took letters to the post office in that way, was inadmissible for want of a sufficient predicate.

 [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 601–604; Dec. Dig. ⬅═182.]

---

⬅═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. COPYRIGHTS ⬤➯73—CONTRACT FOR ROYALTIES—MISTAKE OF FACT—RELIEF.

Where an adapter's contract for royalties on a percentage basis was made under a mistaken assumption that 30 per cent. of the gross receipts from plays played in stock were being paid to the author, when in fact the author's rights had been purchased by the defendant for a small sum, a court of equity would give the adapter some relief, whether based on a mistake of fact or on construction, or actual fraud on part of defendant in not bringing the real facts to his attention.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 66, 71; Dec. Dig. ⬤➯73.]

4. APPEAL AND ERROR ⬤➯232(2)—EXCLUSION OF EVIDENCE—OBJECTION.

In such case, and where the question at the trial as to the admission of the copy was urged purely as a question whether enough had been proven to raise an inference of the receipt of the letter by the plaintiff's representative, the defendant could not, in fairness, take a new position on appeal by claiming that the letter was nevertheless competent on the question of his intention to defraud, which was the fact submitted to the jury.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1430, 1431; Dec. Dig. ⬤➯232(2); Trials, Cent. Dig. § 211.]

5. COPYRIGHTS ⬤➯50—BREACH OF CONTRACT—DAMAGES.

In an action to recover from a theatrical company for royalties received by it for licensing plays adapted by plaintiff to be played in stock, the damages would be the agreed percentage of the proceeds as the contract originally read, without any deduction for an amount mistakenly assumed to have been first paid to the author.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 47, 49; Dec. Dig. ⬤➯50.]

6. COPYRIGHTS ⬤➯50—CONTRACT—DUTY TO DISCLOSE FACTS.

In such case, and where the modification of the contract by an agreement to accept 50 per cent., after deducting the payments to the author, was made on the assumption that such payment was being made, or in ignorance of the fact that the defendant had acquired the author's rights for a small sum, it was the defendant's duty to disclose, or at least to truthfully represent, such facts as were stated as a basis of the modified contract.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 47, 49; Dec. Dig. ⬤➯50.]

Dowling, J., dissenting.

Appeal from Trial Term, New York County.

Action by William G. Fitch, continued after his death by Alice M. Fitch, as executrix under his will, against the Shubert Theatrical Company. From a judgment entered upon the verdict of a jury for upwards of $11,000, the amount of the judgment being directed by the court, defendant appeals. Judgment and order affirmed.

Argued before CLARKE, P. J., and McLAUGHLIN, SCOTT, DOWLING, and SMITH, JJ.

Charles H. Tuttle, of New York City, for appellant.
Melville H. Cane, of New York City, for respondent.

SMITH, J. [1] The plaintiff as executrix of William G. Fitch, deceased, sues to recover from the defendant company for certain royalties received by the said company for licensing the plays "Girls" and the "Blue Mouse" to be played in stock. The term "played in

stock" has a technical meaning in the trade, and refers to a play produced by some company other than the owner under a license, upon the customary compensation of 10 per cent. of the gross receipts. These two plays were adaptations of two German plays made by William Clyde Fitch. William Clyde Fitch died in the fall of 1909. William G. Fitch was one of his administrators, and upon the settlement of his accounts became the owner of this claim. This action was originally brought by William G. Fitch. Thereafter William G. Fitch died, and the action was continued by Alice M. Fitch as executrix under his will. Originally the right to the English-speaking production of the plays was purchased by the defendant from the German authors under a contract that the defendant should pay 30 per cent. of the gross receipts derived therefrom. After the plays were rewritten and put in shape by Clyde Fitch, a contract was made between him and the defendant, giving the rights to license these plays to be played in stock, the said Clyde Fitch to receive 50 per cent. of the income therefrom. This provision was omitted by mistake in the contract in reference to the play called "Girls." In 1908, before the death of Clyde Fitch, the defendant, through its German agent, had purchased the rights of the German authors to this royalty for the sum of $1,200. After this contract was made with Clyde Fitch providing for the payment of 50 per cent., and after the purchase by the defendant of the rights of the German authors, and after the death of Clyde Fitch, the contract was modified by his executrix so as to provide that the 50 per cent. to which the estate of Clyde Fitch was entitled was to be estimated upon the net proceeds, first deducting the 30 per cent payable to the German authors. This modification is claimed to have been induced by the fraudulent representation of the defendant Shubert to the effect that he was paying the German authors 30 per cent. of the gross proceeds from the plays in stock and 50 per cent. to the Clyde Fitch estate, and therefore was only receiving 20 per cent. himself, which was an unfair division as to the defendant. The unfairness of this seems to have been acquiesced in by the estate of Clyde Fitch, and the contracts were therefore modified as before stated, upon the understanding, however, as is claimed by the plaintiff in this action, and as has been found by the jury, that the defendant was at that time still paying to the German authors 30 per cent. of such proceeds. There seems to be abundant evidence from which the jury could have found that such misrepresentations were made, and in fact no question is made that the verdict is against the weight of evidence.

[2] The main question raised and argued upon the brief is to the effect that a certain copy of a letter which was claimed to have been written by Shubert to the administrator of Clyde Fitch was not admitted in evidence. The modification of the contract was contained principally in a letter written by Megrue, one of the administrators of Clyde Fitch, upon February 15, 1911, and that letter in part reads:

"Of all moneys so received the royalties, amounting to 3 per cent. of the gross receipts for the German authors, shall first be deducted, and of the sums that remain there shall be divided equally 50 per cent. to the Shubert Theatrical Company and 50 per cent. to the Clyde Fitch estate."

After the receipt of that letter Lee Shubert, the president of the defendant, swears that he called in the administrator, the writer of the letter, and told him that he had acquired the rights of the German authors. Megrue upon the witness stand swears that Mr. Shubert did not tell him that he had bought out the German authors, or compromised with them in any way, and that the first that he heard thereof was a year and a half after February, 1911, when Mr. Ernst told him, and that he then spoke to Mr. Shubert about it casually, as he was no longer an executor for the Clyde Fitch estate, and Shubert's answer was: "No, Mr. Amberg; my German agent owned them." Shubert swears that within a few days after the receipt of this let- ter of February 15, 1911, he dictated and signed a letter to Megrue. After having called upon the plaintiff to produce that letter, and upon the assertion that no such letter was received, the defendant offered a letter press copy of such a letter, which the trial judge refused to receive, and this ruling is claimed to have been such error as to call for the granting of a new trial. In this letterpress copy of this letter it is stated that the defendant had obtained the German rights.

While there is considerable proof as to the custom of dictating let- ters to a stenographer and the stenographer thereafter placing them in some receptacle, there is no proof that it was mailed by any office boy whose duty it was to take these letters to the post office, or that such was their custom, or that they actually took letters regularly in this way to the post office. It is unnecessary to discuss this evidence, because in the Gardam Case, 198 N. Y. 175, 91 N. E. 371, 139 Am. St. Rep. 806, 19 Ann. Cas. 649, it was held that evidence much stronger than that in the case at bar was insufficient to authorize its introduction, and defendant's counsel upon the argument concedes that the proof alone is not sufficient within this authority. The claim of the defendant's counsel, however, is that in this letter of February 15th Megrue demanded a confirmatory letter from Shubert, and thereafter and upon February 23d Megrue again wrote to Shubert, and did not repeat the demand for a confirmatory letter, but treated the matter of the royalties as settled upon the basis desired by Shubert. The in- ference is sought to be drawn from this failure to repeat the demand in the letter of February 23d that the confirmatory letter, a copy of which is sought to be introduced, had been in fact received by Megrue. The mere fact of failing to renew the request for a confirmatory letter cannot be deemed such an admission of the receipt of the letter claimed to have been written as to make this letter competent evidence.

[3, 4] The further claim is now made that, although this letter was never received by Megrue and although Megrue had no notice, never- theless, if a letter was in fact written and signed with the intention that it should be sent, it was evidence upon the question of the defend- ant's intention to defraud, which was the question of fact submitted to the jury. But if this contract was made by the representative of the Clyde Fitch estate under a mistake of fact, and upon the assump- tion that these moneys were being paid to the German authors, when it turns out that these rights had been purchased for a small sum by the Shuberts, a court of equity will give to the plaintiffs some legal

relief, whether it be based upon a mistake of fact or constructive or actual fraud on the part of Shubert in not bringing to the knowledge of Megrue the real state of the case. Moreover, the question was treated at the trial purely as a question whether enough had been proven to raise an inference of the receipt of the letter by Megrue. It was not there suggested that the letter was competent for any purpose, in case it were written and not received. After having urged its admission on that ground alone, it would not be fair to the trial court, nor to the plaintiff upon this appeal, to take a new position, claiming the letter was nevertheless competent for a purpose which did not occur even to the defendant's counsel at the time the letter was offered, or, if it did occur to him, was suppressed. There was no claim then made that it was offered for any other purpose than to show knowledge in Megrue that the defendants were then the owners of the German rights. Our conclusion is that the refusal to receive the letter in evidence was therefore not error for which a new trial should be granted.

[5] It is further claimed that the measure of damages was not proper. The damages were directed by the court to give to the plaintiff 50 per cent. of the proceeds as the contracts originally read, without any deduction for the amounts paid to the German authors. That would seem to us to be clearly the proper measure of damage, and the court was right in thus assuming. If the defendants had requested, the court might have allowed the defendants one-half of the moneys paid for these German rights, but that was not asked for upon the trial.

[6] It is further objected that the charge of the court was too strongly in plaintiff's favor. The court was evidently strongly impressed with the equity of the plaintiff's claim. The plaintiff had surrendered legal rights under the contracts, and consented to a modification on what he supposed was an equitable demand of the defendants. This was apparently brought about by a concealment of the facts, and by a demand which was far greater than what was equitable, due to a misrepresentation of the actual obligation resting upon the defendants as to the payment of these royalties to the German authors. The administrators of Clyde Fitch would never have consented to a modification of this agreement by which the defendant received $10,000 more than its right, if they had known that before that modification was made the defendant had for $1,200 purchased all of the rights of the German authors, and it is undoubtedly true this modification was made in ignorance of that fact, as to which there was a duty of disclosure, or at least a duty to represent truthfully such facts as were in fact stated.

The judgment should therefore be affirmed, with costs. Order filed.

CLARKE, P. J., and McLAUGHLIN, J., concur.

SCOTT, J. (concurring). I am inclined to think that the question as to the mailing and receipt of the letter, Exhibit B for identifica-

tion, should have been submitted to the jury, in view of Mr. Megrue's refusal to testify positively that he had not received it. But I do not consider the question important, because, as I read the modified contract, the judgment in favor of plaintiff is right as matter of law. It might have been argued with plausibility that, even under the original contract, it was intended that Fitch, the adapter, and defendant, the owner of the playing rights, were to share equally in the net royalties which defendant might realize from producing the play "Blue Mouse" in stock. The purpose of the amended agreement was to make this construction clear. It was therefore provided that the royalties received by defendant for production "in stock" should be divided equally between the Fitch estate and the defendant, after there had been deducted "the royalties, amounting to 3 per cent. of the gross receipts for the German authors." If there were no royalties to be paid to the German authors, there was nothing to be deducted from the gross receipts. As matter of fact there were no such royalties to be paid, because they had been commuted and released by the payment of a lump sum. Thus, under the strict letter of the amended contract, the Fitch estate is entitled to what it has recovered. The provision for a deduction from the gross receipts looked only to the future, and if defendant had wished to be reimbursed for one-half of the payment it had already made in commutation of the royalties, which would have been equitable, it should have so provided in the amended contract.

I am therefore of opinion that, while the receipt in evidence of the letter above referred to might have relieved defendant of the imputation of intentional concealment, it would not have affected the plaintiff's right to recover. The judgment should be affirmed, with costs.

McLAUGHLIN, J., concurs.

DOWLING, J. (dissenting). I believe it was error to refuse to receive in evidence the letter of February 21, 1911, in view of the failure of the witness Megrue to deny its receipt by him, as it bore strongly upon the question of whether or not there was any intention to deceive, misrepresent, or conceal as to the purchase of the rights of the European authors, or any attempt to defraud. Moreover, upon all the evidence in the case, as to the preparation of the letter, the whereabouts of the carbon copy, the failure to deny its receipt and Megrue's letter of February 23, 1911, I think a question was raised for decision by the jury as to whether or not said letter had been sent and received.

I therefore dissent from the affirmance of the judgment, and favor its reversal and the granting of a new trial.